**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| PETER INGRAHAM, ET AL.,           ) | |
| )                                  | |
| Plaintiffs,      ) | |
| vs.                                                ) | NO. CIV-05-0771-HE |
| )                                  | |
| KIA MOTORS AMERICA, INC.,    ) | |
| ET AL.,                                       ) | |
| )                                  | |
| Defendants.   ) | |

## ORDER

This case arises out of a traffic accident involving a 2001 Kia Sportage sport utility vehicle ("SUV"). The accident occurred on July 13, 2003, at approximately 2:15 a.m. The vehicle was being driven west on Interstate 70 near Colby, Kansas, at a relatively high rate of speed.[1] It is undisputed that the driver went to sleep while driving, with the result that the SUV drifted off the roadway onto its north shoulder. At some point the driver awakened and attempted to turn back onto the roadway. She apparently over-corrected and then attempted to re-correct, resulting in the vehicle going into the center median and rolling over several times and coming to rest on its top.[2] In the course of the accident, the driver and a rear seat occupant were ejected from the vehicle and killed. The parties agree that the driver was wearing her seatbelt; the rear seat passenger was not. A child also in the rear seat was in a

---

[1]*Plaintiffs' expert indicates the speed was 76 miles per hour and defendants' expert states that it was between 69 and 77 miles per hour.*

[2]*Plaintiffs' expert concluded the SUV rolled three and a half times. Defendants' expert concluded it rolled four and a half. A witness from another vehicle recalls seeing the headlights a couple of different times, perhaps suggesting two or more rolls. In any event, it is clear that a substantial and violent multiple rollover occurred.*

child safety seat and survived. The plaintiffs here are the estates of the decedents, the driver's surviving husband, the rear passenger's surviving son and daughter, and the child.

Plaintiffs assert a product liability claim based on the alleged defective design of the seatbelt system and a "failure to warn" claim based on alleged inadequacies in the warnings given with the vehicle.[3] Plaintiffs have offered a single expert witness in support of certain critical elements of their claims, Mr. William Kennedy.[4] Defendants moved, on Daubert [5] grounds, to exclude his testimony. Defendants have also moved for summary judgment, arguing in part that, absent Mr. Kennedy's expert testimony on the issues central to the two claims, they fail as a matter of law. Both motions have been fully and extensively briefed. In addition, the court conducted a hearing on the Daubert motion on July 2, 2007.

## I. MOTION TO EXCLUDE EXPERT TESTIMONY

"In accord with [Fed.R.Evid.] 702, the Supreme Court has determined that the [trial judge] 'must ensure that any and all scientific testimony or evidence is not only relevant, but reliable.'" Bitler v. A.O. Smith Corp., 400 F.3d 1227, 1232 (10th Cir. 2004) (quoting Daubert, 509 U.S. at 589). Rule 702 provides:[6]

---

[3]*Plaintiffs initially asserted a products liability claim based on alleged design deficiencies as to the SUV's suspension and frame. They no longer pursue such a claim as an independent basis for recovery.*

[4]*Plaintiffs have identified three other persons as expert witnesses, but it appears none are offered as to the issues to which Mr. Kennedy's testimony is critical.*

[5]*Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).*

[6]*Rule 702 substantially incorporates the principles set out in Daubert, which interpreted an earlier version of Rule 702.*

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In determining the admissibility of expert testimony, the court initially must decide whether the proposed expert is qualified to offer an opinion on the issues involved in the particular case. Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 969 (10th Cir. 2001). A qualified expert possesses the necessary knowledge, skill, experience, training or education relevant to the facts at issue. *Id.* The court must then conduct a two-part inquiry to fulfill its Daubert gatekeeping role, determining first if the expert's proffered testimony has "'a reliable basis in the knowledge and experience of his [or her] discipline.'" Bitler, 400 F.3d at 1232-33 (quoting Daubert, 509 U.S. at 592). In making this determination, the court must decide whether the reasoning or methodology underlying the testimony is scientifically valid. *Id*. at 1233.[7] Second, the district court must inquire "into whether proposed testimony

---

[7]*Among the factors the Court may consider in making its reliability determination are: (1) whether the opinion can be or has been tested for reliability; (2) whether the opinion has been subjected to publication or peer review; (3) whether there are known or potential rates of error associated with the methodology used; and (4) whether the theory has been accepted in the scientific community. Bitler, 400 F.3d at 1233. Courts have also considered whether the proffered opinion has been developed expressly for purposes of testifying, whether the expert has been as careful in forming his opinion for his paid litigation work as he is in his regular profession, whether the expert has adequately accounted for obvious alternative explanations, and whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion. See Fed. R. Evid. 702 advisory committee's note (2000), and cases cited therein.*

is sufficiently 'relevant to the task at hand.'" *Id*. at 1234 (quoting Daubert, 509 U.S. at 597).

Here, Mr. Kennedy proposes to offer two opinions which must be evaluated against the above standards. The opinions essentially are: (1) that the seatbelt system was defectively designed, in that the various components allowed excess slack in the belt to develop at certain times during the rollover, ultimately resulting in an increased "impact load" on the belt, which broke it and allowed the driver to be ejected from the vehicle, and that, in any event, the system was defective because it allowed the driver to be ejected from the vehicle contrary to the standards of the applicable Federal Motor Vehicle Safety Standards, and (2) that the warnings given by Kia as to the vehicle were inadequate because they failed to warn of the increased instability of the vehicle when it was loaded with passengers or cargo.

**A.  Defectiveness of the seatbelt system.**

As noted above, the initial inquiry is whether Mr. Kennedy possesses the necessary qualifications to offer the above-referenced opinion as to the alleged defectiveness of the seat belt system. The court concludes he does not.

Mr. Kennedy identifies himself as a forensic mechanical engineer. He has a bachelor of science degree in mechanical engineering, with some graduate study in that field and several professional affiliations in it. His professional efforts have focused principally on accident reconstruction, with substantial specialized training and experience in that area.[8]

---

[8]*His curriculum vitae describes his work since 1988 as "Investigation, analysis and testimony with respect to transportation and product accident litigation. Testing and*

He has published papers regarding reconstruction of motor vehicle accidents and has attended or lectured at several conferences and seminars concerning railroad and motor vehicle accidents. He indicates he has provided consulting work in connection with over 3000 accidents in his thirty three years plus as a forensic mechanical engineer. He states that he devotes 100% of his time to "studying and analyzing accident related research and actual accidents as a consulting forensic expert in this field." *See* affidavit of William Kennedy, April 20, 2007, ¶ 2. Mr. Kennedy states that he is also a "product failure" expert as it relates to accidents.[9]

If the pertinent opinions in this case related to accident reconstruction, the court would have little hesitation in concluding that Mr. Kennedy is fully qualified to offer them.[10] It was in that capacity that Mr. Kennedy was initially hired by plaintiffs. *See* Mr. Kennedy's October 26, 2006 expert report. Similarly, if the pertinent issue here was a matter of simply identifying the system or part of the car that gave rise to or contributed to the accident, Mr. Kennedy's expertise as a "product failure" expert might well extend to that.[11] Here, however,

---

*analysis of vehicle dynamics as related to accidents.*

[9]*He references "product accident experience" with respect to ladders, chain saws, powered fans, nylon rope, floor buffers and garbage trucks. See C.V. of William K. Kennedy.*

[10]*If, for example, the determinative question here was how the accident transpired or whether the vehicle rolled three and a half, or four and a half, times, Mr. Kennedy would be fully qualified to opine on that issue. Those questions, though related to this case, are not the critical ones for purposes of the pending motions.*

[11]*Here, of course, it is doubtful that expert testimony would be required to identify the seat belt system as impacting the accident. There is no dispute in this case that the driver was wearing a seatbelt and that the belt parted or failed.*

the pertinent inquiry is not whether the seat belt was in use or whether the seat belt or assembly failed to restrain the driver, but rather is whether the seat belt or seat belt assembly was defectively designed.

Mr. Kennedy is not, and does not hold himself out to be, an expert is seatbelt design. He has no formal training in seat belt design. He has no education or experience with seatbelt malfunctions or defects, nor has he published or lectured in the area. He has never acted as an expert on seatbelt design or seatbelt retractor design. He concededly has no familiarity with the design or performance standards applicable to seat belt assemblies or their component parts (except, arguably, as to the ultimate impact of certain federal standards discussed below). When questioned at his second deposition, he could not describe the specifications of the energy management loop ("EM loop") used in the vehicle, nor could he state the benefits or disadvantages of EM loops generally. He could not identify what type of retractor was used in the SUV or state whether it was designed to be locked or unlocked during an accident. He also could not identify the difference between the two types of retractors generally used in seatbelt assemblies. He did not know the tensile strength of the webbing used in the vehicle or in seat belts generally. He also does not hold himself as an

expert in biomechanics[12] or injury causation.[13] As a result, Mr. Kennedy plainly lacks the qualifications necessary to undergird an opinion that the retractor and other components failed or operated in such a fashion as to leave too much slack in the belt.

His methodology is also lacking.[14] He did not perform any tests on the retractor to determine how or whether it would take up (or permit) slack during a rollover. He did not perform a test to assess the validity of his theory that the belt was or could have been broken by impact loading, though he conceded such a test would have been relatively easy to design. He acknowledged that he could locate no scientific literature or other documentation of any instance where a seat belt broke due to an impact load. Further, he testified that he had investigated over 3000 accidents and that this one was the first instance he had found of an impact load breaking seatbelt webbing.

In short, both as a matter of qualifications and of methodology, Mr. Kennedy lacks a sufficient basis for his opinion that the belt failure occurred due to impact load resulting from excess slack allowed by the retractor or other components.

---

[12] *"Biomechanics is 'the science concerned with the action of forces, internal and external, on the living body.' Stedman's Medical Dictionary (25th Ed., 1989). Biomechanical experts have extensive knowledge about how human bodies move when forces are applied to them and thus may provide testimony as to how vehicle occupants move and are impacted in vehicular accidents." Nash v. General Motors Corp., 153 P.3d 73, 75, n.1 (Okla. Civ. App. 2006).*

[13] *Mr. Kennedy does claim to have knowledge as to general occupant kinematics, although he cannot describe occupant kinematics in detail.*

[14] *The evidence at the hearing made it clear that at least some of the matters now relied on by Mr. Kennedy to support his opinion were not even known to him at the time he originally reached it.*

As a sort of fallback, Mr. Kennedy urges that, as a "product failure" expert, he can determine the existence of a system defect without regard to the above considerations.[15] He argues that, since the belt failed and the driver came out of the vehicle, the seat belt system failed to meet federal standards and was therefore, regardless of the specifics, defective.[16] Such an assertion misconstrues the nature and impact of the federal standards. While it is obviously true that the referenced standards are designed to protect occupant safety, they do not prescribe a standard that, for a vehicle to meet federal standards, the seatbelt system must assure that the driver stays in the passenger compartment. Rather, the standards set out a variety of technical standards and specifications which a seatbelt system must meet. Mr. Kennedy does not point to any of those technical standards which the Kia failed to meet. Indeed, plaintiffs concede that the design of the SUV involved here met or exceeded all applicable federal safety standards, including 208 and 209. *See* Fact #72, defendants' summary judgment brief, agreed to by plaintiffs. Reference to the federal standards does not, in the circumstances of this case, provide any additional or alternative basis for a conclusion

---

[15]*It is true that, in some circumstances, it may be unnecessary to identify the particular way in which a product is defective. See* Bitler *at 1238, fn. 7, quoting Judge Kozinski: "Not knowing the mechanism whereby a particular agent causes a particular effect is not always fatal to a plaintiff's claim. Causation can be proved even when we don't know precisely how the damage occurred, if there is sufficiently compelling proof that the agent must have caused the damage ...." Here, however, Mr. Kennedy conceded that the failure of the belt did not, in and of itself, establish the existence of a defect. The FMVSA standards do not suggest the contrary.*

[16]*He argues the seatbelt assembly failed to meet Federal Motor Vehicle Safety Standards 208 and 209, 40 C.F.R. §§ 571.208 and 571.209.*

by Mr. Kennedy as to the existence of a defect.[17]

Accordingly, as Mr. Kennedy's testimony as to the existence of a defect fails to satisfy Rule 702's standards for admissibility, it must be excluded.

### B. Defect due to inadequate warnings.

Mr. Kennedy's opinion as to the failure to warn claim — that the warnings given by Kia as to the vehicle were inadequate because they failed to warn of the increased instability of the vehicle when it was loaded with passengers or cargo — are subject to many of the concerns applicable to the defect issue. His background and experience are not in the area of determining vehicle stability or in identifying conditions related to that. He testified that he is not an expert in vehicle stability design. He has never designed a suspension system for a vehicle. He has neither testified regarding vehicle stability rates, nor published or lectured on the issue of the design of a stability system. His past experience in "product failure" analysis does not relate to SUV rollover tendencies.

His proffered testimony involves, in addition to his opinion as to the risks of the vehicle, the adequacy of the warnings given as to it. However, Mr. Kennedy has no formal training or experience in the analysis or design of product warnings or instructions, save for

---

[17]*Compliance with indicated federal standards does not automatically insulate defendant from liability. See* Smith v. FMC Corp., *754 F.2d 873, 877 (10th Cir. 1985) ("However, compliance with industry standards is not a defense to an action predicated upon manufacturer's products liability.") However, the point here is that the regulations also do not afford a basis for Mr. Kennedy to opine that the system was defective.*

9

that which was involved with his training as a mechanical engineer.[18] He has never assisted in drafting a manual or user's guide for a product, nor has he assisted in developing a warning for a mass-produced product. He has not published or lectured on the subject of product warnings.

Mr. Kennedy's opinion as to the adequacy of the warnings given also fails as against the reliability element of the <u>Daubert</u> analysis. He points to no recognized principles that would guide or suggest the nature of the warnings he believes to be required. He has not compared the warnings given as to this vehicle with those of other vehicles of similar type or of other manufacturers.[19] He did not review federal or industry standards regarding disclosures for SUVs. He did not perform any study on the effectiveness of the instructions or warnings involved.[20] He has not prepared an exemplar of the warning he contends

---

[18]*He did state that instructions to operators is part of basic engineering.*

[19]*Subsequent to his second deposition, Mr. Kennedy located what appears to be part of a driver's manual for UPS drivers, relating to the loading of delivery vans. Given the obvious differences between delivery vans and the SUV involved here, the manual provides little, if any, support for his view that this vehicle was unreasonably dangerous.*

[20]*It is undisputed that the owner's manual for the 2001 Sportage included warnings to always use the seat belts [p. 3-19], to reduce speed when cornering due to the vehicle's higher center of gravity [p. 4-25], and to avoid loading the luggage rack with heavy cargo to reduce the chance of rollover [p. 5-12]. In the addition to being listed in the manual, warnings were affixed to the driver's side sun visor which warned that the vehicle had a higher center of gravity than ordinary cars, that it was not designed to corner at the same speeds as conventional vehicles, and that abrupt maneuvers and excessive speed should be avoided [p. 5-13]. (Page references are to attachments to the Choi deposition, Exhibit K to plaintiffs' summary judgment response.)*

defendant should have given.[21]

As a result of these considerations, the court concludes Mr. Kennedy should not be permitted to offer opinion testimony as to the existence of an unreasonably dangerous condition or the adequacy of the warnings given by defendant.

## II. MOTION FOR SUMMARY JUDGMENT

In order to maintain a product's liability claim under Oklahoma law,[22] a plaintiff must show: (1) the product was the cause of the injury; (2) the product was defective when it left the control of the manufacturer; and (3) the defect made the product unreasonably dangerous to an extent beyond which would be contemplated by the ordinary consumer who purchases the product. Nash v. General Motors Corp., 153 P.3d 73 (Okla. Civ. App., 2006). Defendants urge, and plaintiffs appear to concede,[23] that plaintiffs rely entirely on the testimony of Mr. Kennedy to establish the existence of a justiciable question as to the

---

[21]*Although a warnings expert need not necessarily prepare an exemplar, the presence of one is at least some suggestion of the intellectual rigor that should undergird a conclusion as to adequacy. Further, the absence of an exemplar at least complicates the further determination of whether the proposed warning, if given, would have actually impacted the events involved in the case.*

[22]*Both plaintiffs and defendants have submitted motions addressed to choice of law issues. The parties agree, however, that the laws of the various states are essentially the same as to the elements of a products liability action involved here (essentially, existence of a defect and causation).*

[23]*See Fact #55, defendants' summary judgment brief, stating as a fact that plaintiffs have no evidence of a defect. Plaintiff's response refers only to the testimony of Mr. Kennedy, the warnings attached to Mr. Choi's deposition, and federal standard 209. The warnings actually given are not, in and of themselves, evidence of an unreasonably dangerous condition to disclosed or warned of. The impact of 209 is discussed above.*

existence of a defect (either of design or based on inadequate warnings) and causation. As the court has concluded Mr. Kennedy may not offer opinion testimony as to existence of a defect or as to the failure to warn, and the circumstances do not otherwise establish a basis for claim,[24] the absence of proof is fatal to both of plaintiffs' claims.[25]

### III. CONCLUSION

This case arises out of circumstances which are undeniably tragic. However, to impose responsibility for this accident, in whole or in part, on defendant requires a sufficient showing as to those elements critical to a products defect (including a failure to warn) claim. Plaintiff has relied entirely on the proffered testimony of Mr. Kennedy as to certain of those critical elements. For the reasons set out above, the critical portions of his testimony are inadmissible. Defendant's motion to exclude Mr. Kennedy's expert testimony [Doc. #107] is therefore **GRANTED** insofar as it requests exclusion of his testimony as to the alleged defectiveness of the seatbelt, as to the alleged existence of an unreasonably dangerous condition relating to the SUV's stability, and as to the alleged inadequacy of the warnings and/or instructions. As the exclusion of Mr. Kennedy's testimony results in the absence of

---

[24]*Plaintiffs concede that a seat belt may tear or separate without necessarily being defective. See Fact #15, defendants' summary judgment brief, and plaintiffs' response.*

[25]*The parties have not addressed whether expert testimony on some or all of the pertinent issues here is <u>required</u>. See <u>Nash</u>, 153 P.3d. at 75 (expert testimony is the "best" evidence as to certain causation issues); 63 AmJur2d Products Liability §1222 ("It is necessary, however, to have expert testimony as to the adequacy of a warning where the adequacy of the warning is not obvious to the ordinary lay person.") However, as plaintiffs have based their case entirely on the excluded testimony of Mr. Kennedy as to certain critical issues, it is unnecessary to resolve that further issue here.*

evidence sufficient to create justiciable issues as to critical elements of plaintiffs' claims, defendants' motion for summary judgment [Doc. #108] must also be, and is, **GRANTED**.

    **IT IS SO ORDERED**.

Dated this 10th day of July, 2007.

                                                */s/ Joe Heaton*
                                                JOE HEATON
                                                UNITED STATES DISTRICT JUDGE